SCHOTT, Judge,
dissenting.
The trial court found that the entire area now fenced in for future expansion has been used as a zoo for the past 40 years, and as far back as 1933 animal exhibits were located in the vicinity of Magazine Street and the eastern side of the middle of the park. He thus concluded that no *990 change was being made at all with the erection of the fences around the zoo and ultimate implementation of the Master Plan.
Certain considerations militate against this conclusion. In the first place, the only evidence of the zoo’s location other than on the west side of the middle park section is that some isolated exhibits, i. e., cages containing animals or birds were sprinkled east of Natatorium Drive and south of Magazine Street. But the public could walk in and through the area freely and pass around these exhibits without restriction. In other words, this remained an open space for walking, playing, and picnicking. These exhibits had no different effect on this area of the park than did the location of the sea lion pool and the aquarium which were likewise free and accessible at all times.
On the other hand, the Merz Memorial Zoo was built in 1938 and was anintegrated facility from the beginning culminating with a fenced enclosure in the 1950’s. At that time only 12.7 acres were fenced in, but with the implementation of the Master Plan some 58 acres became fenced and another 11 acres where the playing fields were located became or would become paved parking areas. Thus, what was formerly a 12.7 acre fenced in zoo has now become a 58 acre fenced in zoo in addition to a projected 11 acre paved parking lot, so that over 46 acres have been converted from a park to a zoo.
The conclusion of the trial judge seems erroneous in the light of the following statement included in the August, 1973, report of the City Planning Commission concerning the zoo project:
“More specifically, the open spaces remaining in the middle Park Section after zoo expansion are mainly fringe areas on the periphery of the zoo and along Magazine Street and with only some exceptions these remaining areas were comparatively less desirable for general park use than the open space areas absorbed by the expanded zoo. It must, therefore, be con-
cluded that expanding the zoo in this area to the extent proposed by the Master Plan significantly alters the appearance and utilization of this part of Audubon Park.”
This statement demonstrates that the Master Plan not only contemplates a genuine and substantial expansion of the zoo but also changes the character and nature of the middle section of Audubon Park.
It must be understood that this middle section is the only real part of the park available as such since the front section is dominated by the golf course and the bat-ture section was only recently developed into an open cleared area and is now barren and unattractive. Clearly, the erection of the fence coupled with the proposed construction of the new parking lots has in fact changed the character and nature of the middle portion of the park and the park as a whole.
Plaintiff, as the Attorney General, seeks to protect the interests of the State. Audubon Park is owned by the State and Audubon Park Commission was given the authority to maintain Audubon Park as a park, not to convert it in whole or in substantial part to a zoo. In the absence of some specific legislative authority to make such a conversion the Audubon Park Commission may not do so, and plaintiff is entitled to injunctive relief in the premises.
Defendants have contended that this case falls within the purview of our decision in Upper Audubon Association v. Audubon Park Commission, 329 So.2d 209 (La.App. 4th Cir. 1976) where the plaintiffs sought injunctive relief to halt construction of a curio shop in Audubon Park on zoning grounds, but by the time the case was tried the construction had been completed and this court dismissed the appeal by plaintiffs as moot. This case is not controlling. If plaintiffs were attempting to undo the renovation of the entrance buildings and the construction of the bird house it would have application, but the real thrust of plaintiff’s case is to prevent the implementation of the *991 Master Plan. It is true that the peripheral fence surrounding the 58 acres has already been erected and plaintiff is seeking an injunction to remove that fence beyond the boundaries of the zoo as it existed in 1971. The entire fence contract was for $96,000 out of a total of $1,200,000 spent on the four contracts which have been completed. The zoo expansion program as contemplated in the Master Plan would require the expenditure of some $5,000,000. The mere fact that defendants have thrown a fence around the area which they have included in their Master Plan can hardly be sufficient to prevent plaintiff from preventing the implementation of that plan. The loss to the public of that portion of the fencing beyond the 1971 perimeter of the Merz Memorial Zoo is far outweighed by the loss to the public if the Master Plan is implemented in violation of the law of the State.
An issue raised by defendants is the applicability of the doctrine of laches. As a matter of law, the purpose of the doctrine is to prevent an injustice which might result from the enforcement of long neglected rights and to recognize the difficulty of ascertaining the truth as a result of that delay. Barnett v. Develle, 289 So.2d 129 (1974). The party pleading the doctrine must show a prejudicial change of conditions occurring during this delay and reliance upon the inaction of the other party. Melero v. Bass, 322 So.2d 452 (La.App. 4th Cir. 1975).
Construction began on the Master Plan shortly after the Planning Commission approved of it in September, 1973, but the contract for the fences was not made until October 29, 1974, so that this work began sometime thereafter. This is what prompted the residents in the area to become upset and finally, in June, 1975, the City Planning Commission conducted the first public hearing on the project. The Attorney General was not officially informed of the work until April, 1975, and his suit was filed in June, 1975. Under these facts there is no basis to hold that plaintiff’s suit is vulnerable to a defense of laches.
I recognize that the members of the Commission are well meaning, dedicated and public spirited citizens who are motivated to do what seems to be in the best interests of the citizens of New Orleans. However, because Audubon Park is the property of the State and because I perceive the plan to be a radical change in the nature of the park I do not believe that it was within the authority of the Commission to adopt and implement the plan. The legislature may do so, pursuant to Art. IX, § 1, of the Constitution of 1974 if it were so inclined and if its members felt that this was the will of the people who elect them. In effect, my dissent is not predicated on the demerits of the plan for the zoo but rather on the proposition that the plan’s adoption and implementation is beyond the scope of the Commission’s authority.
I respectfully dissent.